## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DAVID ANDERSON**, | **COMPLAINT** |
| *Plaintiff,* | |
| -against- | Civil Action No.: 1:26-cv-226 (MAD/PJE) |
| **SAMANTHA ROGERS,** **RICHARD A. GETTY**, and **THE GETTY LAW GROUP PLLC**, | Plaintiff demands a jury trial. |
| *Defendants.* | |

Plaintiff, **DAVID ANDERSON** ("**Anderson**"), by and through his attorneys Ianniello Chauvin, LLP (Matthew J. Chauvin, Esq.), as and for his Complaint against **SAMANTHA ROGERS** ("**Rogers**"), and **RICHARD A. GETTY** ("**Getty**"), and **THE GETTY LAW GROUP PLLC** ("**Getty Law**"), respectfully alleges as follows:

### PARTIES AND JURISDICTION

1.      The Plaintiff, David Anderson is a natural person and resident of Ontario, Canada.

2.      The Defendant, Samantha Rogers, is a natural person and resident of the Commonwealth of Kentucky, County of Fayette.

3.      The Defendant, Richard A. Getty, is an attorney duly admitted to practice law in the Courts of the Commonwealth of Kentucky, is a member of the law firm, The Getty Law Group, PLLC, and is a natural person and resident of the Commonwealth of Kentucky, County of Fayette.

4.      The Defendant, The Getty Law Group, PLLC, is a professional limited liability company organized and existing pursuant to the laws of the Commonwealth of Kentucky with a principal place of business within Fayette County, Kentucky.

5.      Collectively Rogers, Getty and Getty Law are referred to as "Defendants."

6.      Jurisdiction is based on and proper pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff, Rogers, Getty and Getty Law. Venue is proper and designated by Plaintiff as the Northern District of New York pursuant to and in accordance with 28 U.S.C. § 1391 (b)(2).

## NATURE OF THE CLAIMS

1.      This matter concerns the actions of the Defendants in commencing and continuing two inexorably intertwined false and malicious court cases against Anderson: (1) *People of the State of New York v. David Anderson, State of New York, City of Saratoga Springs City Court, Case No. CR-01696-23* (“**Criminal Action**”), and (2) *Samantha Rogers v. Anderson, Commonwealth of Kentucky, Fayette Circuit Court, Case No. 23-D-01271* (“**Domestic Violence Action**”).

2.      The Defendants coordinated their actions taken in each case to promote the other case by withholding primary, exculpatory evidence and presenting altered and manipulated evidence to present a false narrative and obtain a false criminal conviction against Anderson in New York state court for their own personal pecuniary gain.

3.      After suffering a false conviction in New York, Anderson endured severe emotional distress which included seven days in the Intensive Care Unit (“ICU”) for stress-related heart issues. While this false conviction was later overturned and both matters resolved in Anderson’s favor, the conduct of the Defendants in commencing and continuing the above referenced actions was performed maliciously, without justification and for a perverted purpose of manipulating the prosecutor and the Courts to cause harm to Anderson.

## FACTUAL BACKGROUND

4.      In October 2021, Anderson and Rogers began a personal relationship that continued on and off for approximately two years. The events surrounding the end of their relationship underly both the Criminal Action and the Domestic Violence Action.

5.      Anderson is a successful owner and breeder of horses, particularly thoroughbred racehorses. In early August 2023, he was scheduled to be at a horse sale in Saratoga Springs, New York. Although Anderson and Rogers had last separated in July 2023, they decided to meet in Saratoga Springs for the sale to see if they might reconcile. Anderson traveled to Saratoga Springs first, with Rogers traveling later to meet him.

6.      On August 7, 2023, Anderson spent the day at the sales to promote the horse he had for sale. The horse sold that evening, and Anderson and Rogers went out to dinner thereafter.

7.      After dinner, Anderson paid the check and wanted to go back to the rental home given his long day. Rogers wanted to stay out, so she told Anderson to go on without her.

8.      Anderson took an Uber to the rental home and went to bed.

9.      Rogers eventually returned to the rental home. When she arrived, she started angrily screaming that Anderson left her at the restaurant. One of the individuals staying in the rental home, Adrian Martinez ("Martinez"), was upstairs and later testified I the Criminal Action that he heard Rogers come in screaming for Anderson and how he had supposedly "left" her at the restaurant.

10.      Rogers then stormed into the bedroom where Anderson was sleeping, turned on the lights and shook him awake. As she continued to scream, Anderson got dressed and went downstairs. Rogers, who was left alone in the bedroom, then went through Anderson's luggage

and stole $6,000.00 in cash that he had brought with him for the trip. Of note, Rogers later admitted to taking the money but claimed she only took $2,000.00 instead of $6,000.00.

11.     After stealing his money, Rogers then took Anderson's phone, accessed his information and erased pictures and text messages that demonstrated her violent, abusive and aggressive conduct against him. Specifically, Rogers erased a picture showing the aftermath of her having clawed Anderson's face with her fingernails while on vacation in the Bahamas. She also erased the accompanying text messages showing that she was the one who had attacked him.

12.     Once Rogers was satisfied that she had removed the evidence of her prior conduct from Anderson's phone, she hid it behind the window curtains and went downstairs.

13.     As Rogers came downstairs, another gentleman staying in the home, Mark Frostad ("**Frostad**"), arrived and was present for the rest of the night.

14.     Rogers joined Anderson and Frostad in the kitchen area of the rental home and the three had a calm conversation about their travel plans and when they were leaving Saratoga Springs the next day. Unbeknownst to Anderson or Frostad, Rogers recorded the conversation on her iPhone 13 Pro Max. As will be further detained below, the Defendants withheld this recording from the New York prosecutor, Mr. Anderson and his counsel for four hundred and eighty-six (486) days. Despite there being no incident between Anderson and Rogers, Rogers then went upstairs, called the Saratoga Springs Police Department at "1:17:02 a.m.," and claimed that Anderson had "destroyed" her property. The police arrived at the rental home minutes later.

15.     When interviewed by the officers, Rogers claimed that she had been downstairs with Anderson and Frostad when Anderson suddenly left them, went through the kitchen, the living room, and then started heading upstairs to their bedroom so he could "destroy" her property. Rogers claimed that she followed Anderson upstairs, where the two then had a physical struggle

in the doorway of their bedroom. Rogers alleged that Anderson repeatedly "slammed" the bedroom door on her, and that she was "screaming that he was hurting [her]." Rogers alleged that Anderson then suddenly stopped slamming the door on her before retreating further into the bedroom. Rogers claimed that she "sat there" to "shrug off" what had just happened, before following Anderson further into the bedroom. After following Anderson once more, Rogers claimed that Anderson "slapped or punched" her. Rogers stated that after another "20 to 30 seconds," she called 911.

16.     Rogers' claims were false.

17.     All of the officers that appeared on the scene closely examined Rogers and the house and found no marks, bruises or physical evidence of any domestic violence.

18.     The officers spoke with Anderson and Frostad, both of whom confirmed that there was no violence nor did the latter hear any commotion or violence while Rogers was upstairs.

19.     After discussing the matter amongst themselves, the officers agreed that the matter was "nothing." While Rogers requested that Anderson be charged, the officers refused. The officers advised that Rogers could stay somewhere else if she wanted, but she chose not to.

20.     The officers then departed.

21.     The next day Anderson terminated the relationship with Rogers.

22.     Upon information and belief, Rogers retained and/or was otherwise advised by Getty and Getty Law following the Saratoga Springs trip and prior to litigation being filed.

23.     In the month following the Saratoga Springs trip, Anderson and Rogers spoke via telephone several times. Each call was made to and from the parties' personal cell phones, except for two calls that Rogers made to Anderson in which she attempted to extort more than $100,000.00. For those two calls, Rogers attested that she purchased a pre-paid burner phone so she could contact Anderson without her number showing up. The first burner phone call occurred

on September 3, 2023, in which Rogers demanded that Anderson pay her $60,000.00 (monthly payments of $5,000) and her rent in full for the next year ($35,000.00-$40,000.00). Rogers advised that she would give Anderson twenty-four (24) hours to respond and pay these amounts, or she would file a false domestic violence case regarding the Saratoga Springs trip. Twenty-four hours later, Rogers called Anderson again with the burner phone on September 4, 2023. Anderson refused to pay the money as demanded by Rogers. When asked about these calls, Rogers testified she could not "recall" if she asked Anderson for money. Notably, Rogers testified to recording the other telephone conversations between the parties during this time period, but claims that she somehow did not record either of the burner phone calls where she attempted to extort Anderson.

24.     Rogers' phone records show that she then called Getty and/or Getty Law.

25.     Getty Law later represented that they made a copy of Rogers' iPhone 13 ProMax when they agreed to represent her so they would "have all the evidence in one place."

26.     True to Rogers' extortion threat, Rogers filed the Domestic Violence Action against Anderson in the Fayette County Circuit Court in Lexington, Kentucky on September 6, 2023.

27.     On September 16, 2023, just ten days later, Anderson had dinner with friends in Lexington, Kentucky. Upon leaving, Anderson saw a waitress and known friend of Rogers. In an abundance of caution and to ensure the parties would not cross paths, Anderson notified the waitress that he was headed to the downtown restaurant and bar, Bourbon on Rye.

28.     Surveillance footage showed Anderson and his friends arriving at Bourbon on Rye at 11:35 p.m. It further shows Anderson and his friends occupying a high-top table that was fully visible to the front door and to any patron entering the establishment.

29.     Approximately twenty-five minutes after Anderson arrived, Rogers appeared at the front door of Bourbon on Rye at 11:59 p.m.

30.    One of the individuals accompanying Anderson—Rami Kalla ("Kalla")—was standing outside and spotted her. Kalla notified Rogers that Anderson was in Bourbon on Rye. Rogers smiled at him and then chose to walk into the establishment knowing Anderson was present.

31.    From the surveillance footage, Rogers is seen entering Bourbon on Rye, smiled to her companions upon seeing Anderson, then approached Anderson and sat down right next to him. The video excerpt with identification of Rogers and Anderson is shown below:





32.    When Anderson realized Rogers approached him, he immediately left.

33.     As detailed below, during the pendency of the court cases, Rogers would frequently appear behind Anderson in traffic and follow him until she was spotted. She would show up at restaurants and social events where Anderson was, obviously trying to force an interaction that she could claim is a violation of court orders.

34.     Upon information and belief, the Defendants conspired to seek out Anderson to create a circumstance where she could falsely claim Anderson was in violation of the court orders to gain an unfair advantage in the court proceedings.

35.     After the Domestic Violence Action was filed, the Defendants undertook a highly sophisticated series of acts to conceal the evidence that was harmful to their claims and to present manipulated evidence to support their claims. Simultaneously, while hiding the adverse evidence and presenting the manipulated evidence, the Defendants tried to advance the Domestic Violence Action to a final hearing without disclosing the evidence that refuted their claims.

36.     On February 16, 2024, seven months after the alleged incident, and just weeks before the Domestic Violence Action hearing was scheduled to be heard, Rogers flew to Saratoga Springs, New York and filed the Criminal Action for Harassment, Second Degree against Anderson for the alleged events of August 8, 2023. Rogers signed the complaint herself, swearing to its' truthfulness and accuracy in front of Judge Francine Vero in the Saratoga Springs City Court. Rogers had to sign the complaint personally as the Saratoga Springs Police Department had steadfastly refused to charge Anderson with any crime.

37.     As a result, Anderson moved the Domestic Violence Court to stay the proceedings pending the resolution of the Criminal Action. The Domestic Violence Court agreed.

38.     On October 16, 2024 the New York prosecutor in the Criminal Action produced an email correspondence from Rogers to his office where she provided a video which had been

modified to make it appear as though Anderson had stalked Rogers while at the Keenland racecourse in Lexington, Kentucky and claimed that she was forced to call the Sheriff's office as a result.

39.    The original, unmodified, version of the above video shows that Rogers and her friend purposefully targeted Anderson and went to his location and then called the Sheriff to try to have additional, false charges brought against him.

40.    Despite the original, unmodified video showing that Rogers and her friend targeted Anderson to set him up, on October 5, 2024 Rogers sent an email to the Saratoga County District Attorney's office, stating the following:

> Hi Mollie, I just wanted to send a quick note that I've seen David [Anderson] a couple of times in the last two weeks. . . . Then last week I was at the horse races with a friend. She was attempting to take a couple of photos of me when she noticed David [Anderson] himself taking photos/videos. She then recorded him. David [Anderson] is the gentleman sitting below the man in the pink sports coat. He's sitting under an umbrella and has dark shades on. It is blurry and happens so fast, but you can see him point his dark phone at us and take a photo. He done it numerous times while we were there. I realize this doesn't seem like much, but it causes me severe anxiety. He seems to constantly be watching me while he's out. These are moments that have been caught. I'm fearful of what he's doing that I'm not aware of. I did call and report the second incident to the Sheriff's office Saturday. Wanted you to have the info in case it came up next month at trial. I'm going to send the video separately. It's too large to attach here.

41.    Unbeknownst to the New York prosecutor, Rogers and/or Getty deleted the portion of the video where her friend said, "I got him," showing that Rogers was the one filming Anderson. Then, based on the time stamps of the videos, Rogers immediately crossed through the Clubhouse of the Keeneland racecourse, and went upstairs to  Anderson's box, before she then called the Sheriff's Office to try to have him arrested for violating the New York Temporary Order of

Protection (the Kentucky order had already been modified to allow Anderson to remain where he was).

42.    The unedited video, together with pictures of Rogers taken almost immediately thereafter, walking behind Anderson's box clearly shows that the evidence was modified to create the appearance that a crime had been committed when it had not. This false allegation and the manipulated evidence was then provided to the New York prosecutor.

43.    The document production from the New York prosecutor showed that the prosecutor was provided additional edited files to support a false narrative.

44.    The bench trial in the Criminal Action began on December 5, 2024 at 9:00 a.m..

45.    At 1:56 a.m. that morning, Rogers sent an email to the New York prosecutor attaching the previously withheld recording from the August 8, 2023 Saratoga Springs incident for the first time. This was the recording that Rogers took during her conversation with Anderson and Frostad in which they calmly discussed their travel plans. The Defendants actively concealed this recording from Anderson, the Courts and the New York prosecutor for four hundred and eighty-six (486) days and produced it on the morning of the trial.

46.    The New York prosecutor shared the recording with Anderson and his counsel minutes before the trial at 8:46 a.m. on December 5, 2024. Anderson thus had no opportunity to have the recording reviewed by an expert.

47.    During the trial, Rogers testified that the recording was made at "11:30 p.m.," placing it nearly two hours before she called 911 at 1:17:02 a.m.

48.    Relying on Rogers' false testimony that the recording was made considerably earlier in the evening, the Criminal Court disregarded the evidence and entered a Decision and Order finding Anderson guilty of Harassment (Second Degree) on December 11, 2024.

49.     Within days after the criminal trial's conclusion, the Defendants began producing additional previously withheld evidence. During this time, Anderson also had the recording forensically analyzed.

50.     On December 9 and 10, 2024, Defendants produced the native file (including the original metadata) of the recording from the night of the Saratoga Springs incident: "IMG_1256." Unbeknownst to the Criminal Court and Anderson, the native file of the recording shows that the recording actually began at "1:14:02 a.m." and ended at "1:15:52 a.m." As detailed above, the 911 call was answered by the Saratoga Police Department at "1:17:02 a.m.," just seventy (70) seconds after Rogers stopped the recording, not two (2) hours before the incident as she testified.

51.     Rogers also testified that she did not call the police for 20 to 30 seconds after the alleged physical altercation.  Therefore, the recording was taken during the time when she alleged that there was a terrible argument, that escalated and turned into two physical altercations. However, the recording is emphatically contradictory to the Defendants' claims and shows that her testimony and the claims were false.  This explains why the Defendants deliberately hid the video for over a year while they tried to push both the Criminal Action and the Domestic Violence Action through the court systems.

52.     In addition to the recording referenced above, the Defendants produced other exculpatory evidence that had been previously withheld after the criminal trial. On December 9, 2024, and December 10, 2024, a primary piece of evidence that was produced after the criminal trial was a photograph from the night of the alleged incident, which is shown below.



This photograph, "IMG_1258" was significant as Rogers claimed that Anderson injured the lower *back* of her arm during the alleged Saratoga Springs incident. The photograph she took on the night of the alleged incident of her alleged injury, however, was of the upper *front* of her arm. This photograph is of high quality, taken in good lighting, and shows no injury to her arm. This photograph was concealed for four hundred ninety (490) days.

53.    The post-trial productions also included the full, unedited video from the Keeneland racecourse incident described above, rather than the edited version provided to the New York prosecutor previously.

54.    During the criminal trial, Rogers testified that she did not have sufficient funds available to her to pay for an Uber on the night of the Saratoga Incident. The post-trial discovery revealed that this was false.

55.    Importantly, the later discovery revealed that Rogers visited two different make-up stores upon returning to Lexington, Kentucky on the day after the alleged incident. This was significant as Rogers' photographs of a purported bruise to the back of her arm was taken in her car just after going to those make-up stores.

56.     The December 9, 2024, and December 10, 2024, productions also included files with their purported original file name, e.g. "IMG_001." In prior productions, this information had been removed from many of the files so as to mask when and how it was captured in relation to other files. Now that these productions included the original file name, Anderson was able to see files missing *in between* those that were provided. For example, "IMG_001" would be provided, with metadata showing it was taken on a certain date and time. "IMG_024" would also be produced, showing it was taken an hour after "IMG_001." This showed the missing files in between those previously produced, e.g. IMG_002-IMG_0023.

57.     Following these productions, Anderson propounded a Second Set of Interrogatories, Requests for Production of Documents and Requests for Admissions on Rogers in the Domestic Violence Action. These requests focused on Rogers and Getty's manipulation of the evidence including, but not limited to: (a) modifying file names, (b) converting files to remove metadata, (c) withholding files, etc. A second set of document productions after the criminal trial occurred on April 8, 2025 and April 9, 2025. The photographs, videos and other documentation provided in these productions showed that *several* of the earlier produced files were edited. For example, the Defendants produced a video entitled "Bahamas 5 IMG_5186" in the November 22, 2023, production. That file was two minutes and twenty-seven seconds (2:27) long, as shown below:



**Bahamas 5 IMG_5186**

November 22, 2023  •  Ann Stith  •  HD

The Defendants produced this same two minute and twenty seven second (2:27) video in their March 22, 2024 production. In their April 8-9, 2025 productions, however, the new version of this video, "IMG-5186" was eighteen minutes and nine seconds (18:09):



Rogers, Getty and/or Getty Law therefore edited out fifteen minutes and forty-two seconds (15:42) from the videos that they produced prior to the criminal trial. This was highly prejudicial, as the New York prosecutor was provided with the edited version of this video and unknowingly attempted to use the false facts shown therein in a *Molineaux* proffer which was provided to the Saratoga Springs City Court prior to the criminal trial. The deleted portion of the video showed an incident wherein *Rogers* attacked Anderson (causing scratch marks to his face), Anderson's repeated requests for Rogers to stop hitting him and his threats to call the police if she did not stop.

58. In another example, the Defendants produced a forty-seven second (00:47) video with the name "IMG_5144" in their November 22, 2023, March 22, 2024 and December 8-9, 2024, productions, as shown below:



In their post-trial April 8-9, 2025, productions, however, the Defendants produced two new versions of this video, one that is fifty-one seconds (00:51) and another that is six minutes and thirty seconds (6:30), as shown below:



**Rogers 4995 IMG_5144**

April 9, 2025  ·  Ann M. Stith  ·  HD



**Rogers 4994 IMG_5144(1)**

April 9, 2025  ·  Ann M. Stith  ·  HD

59.    Therefore, the Defendants were able to have the prosecutor present to the Judge that would ultimately decide the case without a jury false information to influence his impression of Anderson and his decision in the case.

60.    Once it was discovered that the most pertinent evidence in the case had been altered or manipulated, the Domestic Violence Court ordered that the original source of the evidence, Rogers' iPhone 13 Pro Max, be submitted to a Digital Forensics Expert by June 19, 2025.

61.    Instead of complying with the Court Order to produce the phone to the Digital Forensic expert, the Defendants switched out the Apple iPhone 13 Pro Max that was the subject of the Court Order with a completely different phone, an Apple iPhone 16. Apparently hoping no one would discover the switch, Defendants had the other phone copied and told the Court that by copying the phone, it showed that they were not trying to "obfuscate evidence." However, switching the phones actually reinforced that was exactly what the Defendants were doing.

62.    When the manipulation of evidence and switching out of the phone issues were presented to the Domestic Violence Court, the Defendants moved the Court to dismiss the case rather than comply with the Court Order to have the correct phone properly analyzed by a digital forensic expert. The Domestic Violence Court granted the Defendants' request and dismissed the case.

63.    After discovering the manipulation of evidence, Anderson moved the New York Criminal Court to Vacate the Judgment of Conviction.

--15--

64. The prosecutor in the New York criminal case reviewed the evidence and agreed that he would not oppose the Motion to Vacate the Judgment of Conviction. Anderson then moved the New York Criminal Court to dismiss the Criminal Action with prejudice, citing the newly discovered evidence. At the Motion to Dismiss the Criminal Action the prosecutor in New York not only did not oppose the motion, but actively joined with Anderson to support the dismissal.

65. In granting Anderson's motion to dismiss the charge against him, the New York Criminal Court held in pertinent part:

> Equally important, if not more so, is that the Court now knows that the video was taken well over an hour after the victim testified that she took it and, likewise contrary to her testimony, only moments before the alleged altercation took place, thereby making it seemingly impossible for the altercation to have taken place as described in her testimony.

66. The Defendants' acts as described herein directly and proximately caused, and continue to cause damages to Anderson, including but not limited to a stress-related heart condition which resulted in a more than seven (7) day stay in the intensive care unit.

67. The Defendants acts were performed maliciously and to obtain unwarranted funds from Anderson.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Abuse of Process in Filing and Pursuing the New York Criminal Action)

68. Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "67" with the same force and effect as though more fully set forth at length herein.

69. As is set forth at length herein *supra*, with malicious intent, the Defendants utilized, maintained and continued regularly issued legal process for a collateral objective, and for the

perverted purpose to obtain an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

70.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages, in an amount to be determined at the time of trial of this action.

71.    Anderson requests all relief and damages that he may be entitled, together with the imposition of punitive damages in the amount this Court determines to be just.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Conspiracy to Commit an Abuse of Process)

72.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "67" with the same force and effect as though more fully set forth at length herein.

73.    As is set forth at length herein *supra*, the Defendants conspired with one another with malicious intent to use regularly issued legal process for a collateral objective intending to do harm to Plaintiff, specifically for the perverted purpose to obtain an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

74.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages in an amount to be determined at the time of trial of this action.

75.    Anderson requests all relief and damages he may be entitled, together with the imposition of punitive damages as this Court deems just.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Aiding and Abetting a Fraudulent Scheme of Abuse of Process)

76.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "75" with the same force and effect as though more fully set forth at length herein.

77.    As is set forth at length herein *supra*, the Defendants each aided and abetted each other in using regularly issued legal process with malicious intent to abuse the legal system for a collateral objective, specifically for the perverted purpose to obtain an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

78.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages in an amount to be determined at the time of trial of this action.

79.    Anderson requests all relief and damages he may be entitled, together with the imposition of punitive damages as this Court deems just.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Malicious Prosecution of the New York Criminal Action)**

80.    Plaintiff repeats, reiterates, and realleges, every allegation contained in Paragraphs "1" through "79" with the same force and effect as though more fully set forth at length herein.

81.    As is set forth at length herein *supra*, the Defendants initiated and continued to pursue a criminal proceeding with malicious intent and lack of probable cause.

82.    The criminal proceeding terminated in Anderson's favor.

83.    The Defendants' acts constitute malicious prosecution under New York Law.

84.    As a direct and proximate cause of the Defendants' acts, Anderson suffered and continues to suffer damages, in an amount to be determined at the time of trial of this action.

85.    Anderson requests all relief and damages he may be entitled, together with the imposition of punitive damages as this Court deems just.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Conspiracy to Commit Malicious Prosecution)

86.　　Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "85" with the same force and effect as though more fully set forth at length herein.

87.　　As is set forth at length herein *supra*, the Defendants conspired among each other to have Anderson criminally prosecuted.

88.　　The Defendants' conduct was intentional, malicious and without probable cause.

89.　　The criminal case terminated in Anderson's favor.

90.　　Anderson suffered and continues to suffer damages as a direct and proximate cause of the Defendants' conduct.

91.　　The conduct described hereinabove constitutes a conspiracy to commit malicious prosecution under New York law

92.　　Anderson requests damages in an amount to be determined at the time of trial of this action, together with the imposition of punitive damages this Court determines to be just.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Aiding and Abetting a Fraudulent Scheme of Malicious Prosecution)

93.　　Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "92" with the same force and effect as though more fully set forth at length herein.

94.　　The Defendants each aided and abetted each other to perpetrate a fraudulent scheme of malicious prosecution against Anderson.

95.     The Defendants knew of the fraud being perpetrated and substantially aided and abetted each other in maliciously and without probable cause pursuing a criminal case against Anderson.

96.     The criminal case was dismissed in Anderson's favor.

97.     Anderson suffered and continues to suffer damages as a direct and proximate cause of the Defendants' conduct.

98.     The Defendants' conduct constitutes malicious prosecution under New York Law.

99.     Anderson requests all damages that he may be entitled, including punitive damages in the amount this court determines is just.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Abuse of Process in Filing the Kentucky Domestic Violence Action)**

100.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "99" with the same force and effect as though more fully set forth at length herein.

101.    As is set forth at length herein *supra*, with malicious intent, the Defendants utilized regularly issued legal process for a collateral objective intending to do harm to Anderson without excuse or justification, in such a perverted manner which was designed to obtain the collateral objective of achieving an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

102.    The acts in the Kentucky Domestic Violence action were intertwined with, and in furtherance of the New York criminal case.

103.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages, in an amount to be determined at the time of trial of this action.

104.    Anderson requests all relief and damages that he may be entitled, together with the imposition of punitive damages in the amount this Court determines to be just.

### AS AND FOR A EIGTH CAUSE OF ACTION
### (Conspiracy to Commit an Abuse of Process)

105.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "104" with the same force and effect as though more fully set forth at length herein.

106.    As is set forth at length herein *supra*, the Defendants conspired with one another to use the regularly issued legal process without excuse or justification, intending to do harm to Anderson in such a perverted manner which was designed to obtain the collateral objective of achieving an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

107.    The acts in the Kentucky Domestic Violence action were intertwined with, and in furtherance of the New York criminal case.

108.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages in an amount to be determined at the time of trial of this action.

109.    Anderson requests all relief and damages he may be entitled, together with the imposition of punitive damages as this Court deems just.

### AS AND FOR A NINTH CAUSE OF ACTION
### (Aiding and Abetting a Fraudulent Scheme of Abuse of Process)

110.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "109" with the same force and effect as though more fully set forth at length herein.

111.    As is set forth at length herein *supra*, the Defendants each aided and abetted each other, with knowledge of the fraud being perpetrated, to use regularly issued legal process without excuse or justification, intending to do harm to Anderson in such a perverted manner which was designed to obtain the collateral objective of achieving an unfair advantage in the legal proceedings to obtain unwarranted funds from Anderson.

112.    The acts in the Kentucky Domestic Violence action were intertwined with, and in furtherance of the New York criminal case.

113.    As a direct and proximate result of the Defendants' conduct, Anderson has suffered and continues to suffer damages in an amount to be determined at the time of trial of this action.

114.    Anderson requests all relief and damages he may be entitled, together with the imposition of punitive damages as this Court deems just.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

115.    Plaintiff repeats, reiterates, and realleges, each and every allegation contained in Paragraphs "1" through "114" with the same force and effect as though more fully set forth at length herein.

116.    As is set forth at length herein *supra*, the Defendants engaged in a course of extreme and outrageous conduct that caused Anderson severe mental anguish.

117.    The Defendants' extreme and outrageous conduct exceeded all bounds of decency and tolerability in society.

118.    The Defendants acted with the intent to cause, or disregard of the substantial probability of causing, severe emotional distress to Anderson, and as a direct and proximate cause of the Defendants' conduct, Anderson suffered and continues to suffer damages, including over seven (7) days in the intensive care unit of the hospital for stress-related heart condition.

119.    Anderson requests all damages this Court deems him entitled, including punitive damages as this Court deems just.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays judgment be entered against Defendants as follows:

    a.    On Plaintiff's First Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    b.    On Plaintiff's Second Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    c.    On Plaintiff's Third Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    d.    On Plaintiff's Fourth Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    e.    On Plaintiff's Fifth Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    f.    On Plaintiff's Sixth Cause of Action, an award of monetary damages in an amount to be determined at trial but in no event less than, together with an award of punitive damages against Defendants;

    g.    On Plaintiff's Seventh Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    h.    On Plaintiff's Eighth Cause of Action, an award of monetary damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

    j.    On Plaintiff's Ninth Cause of Action, an award of money damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

k.     On Plaintiff's Tenth Cause of Action, an award of money damages in an amount to be determined at trial, together with an award of punitive damages against Defendants;

l.     Granting such other and further relief as this Court may deem just and proper including but not limited to the costs and disbursements of this action and reasonable attorneys' fees.

Dated: February 11, 2026

IANNIELLO CHAUVIN, LLP

By:     _____
        Matthew J. Chauvin, Esq.
        *Attorneys for Plaintiff*
        6 Butler Place
        Saratoga Springs, NY 12866
        Bar Roll No.: 513145
        mchauvin@iclawny.com
        (518) 371-5010